# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BERKO INVESTMENTS, LLC, ROBERT BERKOWITZ, BERK-LIN, INC., and 255 VENTURE INN, INC.<br>　　Plaintiffs,<br><br>　　　　v.<br><br>STATE NATIONAL INSURANCE COMPANY, INC.<br>　　Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br><br><br>NO. 08 - 2609 |

DuBOIS, J.　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　July 21, 2010

## MEMORANDUM

### I. INTRODUCTION

　　This case arises out of storm damage to the roof of the Venture Inn, a bar and restaurant in Philadelphia, PA, on April 15, 2007. Plaintiffs—Berko Investments, LLC, Robert Berkowitz, Berk-Lin, Inc., and 255 Venture Inn, Inc. (hereinafter referred to collectively as "Berko")—proceeded with repairs to the roof before reporting the claim to defendant State National Insurance Company ("State National") and thereby prevented State National from inspecting the damaged roof in order to determine the cause and origin of the damage, and the type of repair required. Berko claims that State National breached its insurance contract and violated Pennsylvania's bad faith statute, 42 Pa.C.S.A. § 8371, when it denied Berko's insurance claim.

　　Plaintiffs filed suit in the Court of Common Pleas, Philadelphia County. The case was removed to this Court on June 4, 2008 under 28 U.S.C. § 1441. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

　　A bench trial was held on June 1, 2010 and June 2, 2010. After considering the testimony

of the witnesses, the exhibits received in evidence, and the arguments of counsel, the Court finds in favor of defendant and makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a):

## II. FINDINGS OF FACT:

1. Berko owns and operates the Venture Inn located at 255 S. Camac Street, Philadelphia, PA 19107. (Stipulation of Uncontested Facts (hereinafter "St.") ¶¶ 1-4); (Transcript of Non-Jury Trial Before the Honorable Jan E. DuBois, 68 (June 1, 2010) (hereinafter "Tr. June 1")).

2. The Venture Inn is a three-story brick building with a "step down" one-story lower roof over the bar and dining room area. The building contains both apartments and a restaurant. (Tr. June 1 at 19-20).

3. Berko purchased commercial property insurance covering the Venture Inn through the Carmen Group, an insurance broker for State National, in January 2007. (Tr. June 1 at 71); (Trial Ex. P-1).

4. State National issued an insurance policy ("Policy") on the property to Berko—Policy Number RCA004325-07— covering the period January 31, 2007 to January 31, 2008. (St. ¶4); (Trial Ex. P-1).

5. The "Declarations Commercial Package Policy" page of the Policy provides that the building is covered up to $450,000 and the section entitled "covered causes" references "special incl. theft." (Trial Ex. P-1).

6. The "Causes of Loss - Special Form," as referenced in the declarations page, states:

   A. Covered Causes of Loss
       When Special is shown in the Declarations, Covered Causes of Loss means
       Risk Of Direct Physical Loss unless the loss is:
       1. Excluded in Section B., Exclusions; or
       2. Limited in Section C., Limitations . . .

(Trial Ex. P-1).

7. Plaintiffs claim that the roof was damaged by wind. The Court finds that wind damage is neither excluded under Section B nor limited under Section C. Accordingly, wind damage is a covered loss under the Policy. (Tr. June 1 at 21); (Trial Ex. P-1, SN-6).

8. The Policy states the following as "Duties In The Event of Loss Or Damage":

> a. You must see that the following are done in the event of loss or damage to Covered Property . . .
> (2) Give us prompt notice of the loss or damage. Include a description of the property involved.
> (3) As soon as possible, give us a description of how, when and where the loss or damage occurred.
> (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.
> (5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.
> (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

(Trial Ex. P-1) (the "Duties Provision").

9. On April 15, 2007, the one-story lower roof of the Venture Inn began to leak over the dining room area. (Tr. June 1 at 73).

10. Robert Vincent, a general contractor, was a patron in the bar on the evening of April 15, 2007 when the roof began to leak. (Transcript of Non-Jury Trial Before the Honorable Jan E. DuBois, 13-14 (June 2, 2010) (hereinafter "Tr. June 2")).

11. Vincent climbed onto the roof over the dining area to ascertain the origin of the leak on April 15, 2007. (Tr. June 2 at 15).

12. While on the roof, Vincent observed that the roof had peeled back. He also noticed that the K gutter (the gutter attached to the side of building that collects water coming off of the roof) was detached from the wall. (Tr. June 1 at 20); (Tr. June 2 at 15-16).

13. Vincent "pushed back the K gutter as much as [he] could" but completed no other repairs on April 15, 2007. (Tr. June 2 at 16-17).

14. On April 16, 2007, at Berkowitz's request, Vincent made temporary repairs to the roof—he applied perforated paper and mastic tar to the damaged area. (Tr. June 1 at 38); (Tr. June 2 at 15, 17).

15. Vincent stated that the temporary repair could not withstand "heavy work," and recommended to Berkowitz that he hire a roofer to fix the roof. (Tr. June 1 at 77); (Tr. June 2 at 18, 20).

16. Berkowitz agreed with Vincent and entered into an agreement with Vincent to "have work done on the roof." (Tr. June 2 at 20); (Trial Ex. P-3).

17. Sometime between April 20, 2007 and April 25, 2007, Vincent contacted Anthony Marinucci, a sub-contractor and roofer he had used in the past, and instructed him to evaluate the damage to the roof. (Tr. June 1 at 18); (Tr. June 2 at 22).

18. When Marinucci arrived at the Venture Inn he examined the completed temporary roof repair and concluded that it would prevent water from leaking into the building for a short time, but the roof would eventually begin leaking again. (Tr. June 1 at 21, 43-44).

19. Marinucci observed that the K-gutter was pulled away from the building and the coping and flashing—the materials at the top edge of the roof that channeled water into the gutter—were "destroyed." (Tr. June 1 at 21).

20. Marinucci could have improved the temporary repair but he would not have issued a

warranty for the work. (Tr. June 1 at 48).

21. Marinucci completed his physical examination of the roof and then gave Vincent an estimate covering the cost of repairing and replacing the roof. (Tr. June 1 at 19); (Trial Ex. P-6).

22. Marinucci opined that, based on the damage to the roof, the entire roof needed to be replaced. (Tr. June 1 at 21).

23. Marinucci completed a proposal, on Vincent's letterhead, for the permanent repairs to the roof and Vincent presented that proposal to Berkowitz. The proposal, which included a description of the materials to be used, stated that the damaged areas of the roof were to be removed and the areas that did not need to be removed were to be repaired. The total cost of the work was $10,800. (Tr. June 2 at 26); (Trial Ex. P-6).

24. The roof replacement work occurred over two days. (Tr. June 1 at 33).

25. On April 25, 2007, following the completion of the roof work, Marinucci issued a ten year warranty on the roof to Berkowitz. (Tr. June 1 at 32, 33); (Trial Ex. P-5).

26. Some time before or after Marinucci completed the roof repairs, Vincent told Berkowitz that the roof was damaged by the weather and that because weather damage was covered by insurance, he should file an insurance claim. (Tr. June 1 at 77-78); (Tr. June 2 at 52-53).

27. On April 30, 2007, Berkowitz filed an insurance claim with Carmen. Berkowitz reported that during a storm on April 15, 2007, the roof over the dining area began to leak. (St. ¶¶ 5-6); (Tr. June 1 at 78).

28. Berkowitz knew that the roof was completely replaced before the insurance claim was filed, but did not relay that information to Carmen when he reported the claim. (Tr. June 1 at 78-79).

29. On May 1, 2007, State National, through its third party claims administrator RCA, instructed Tri State Adjusters to investigate the claim. Edward Minto of Tri State Adjusters was

assigned to the claim. (Tr. June 1 at 125, 149-150).

30. Minto was instructed by RCA to inspect the property and attempt to determine the cause and origin of the damage. (Tr. June 1 at 152).

31. RCA authorized Minto to enlist a structural engineer—as Minto has done in the past—to determine the cause and origin of the damage, and what repairs were required. (Tr. June 1 at 152-53).

32. Minto contacted Berkowitz within twenty-four hours of receiving the claim on May 1, 2007, and scheduled an inspection of the premises on May 8, 2007. (St. ¶ 7); (Tr. June 1 at 154).

33. Minto conducted his initial inspection of the Venture Inn on May 8, 2007. (Tr. June 1 at 154).

34. Minto toured the property, including the roof, with Vincent. He also took pictures of the property and interviewed Vincent. (Tr. June 1 at 155).

35. Vincent told Minto that the entire roof needed to be replaced, and he arranged to have that done. He did not inform Minto that a temporary repair was in place prior to the replacement of the entire roof. (Tr. June 1 at 155).

36. Minto did not hire an expert to examine the roof because the roof repairs had been completed before the loss was reported to State National. (Tr. June 1 at 154); (Trial Ex. P-12).

37. Minto testified that while Berko had a duty under the policy to cover—to "[t]ake all reasonable steps to protect the Covered Property from further damage"—the temporary repair, described in the trial testimony, was sufficient to protect the property, and would have permitted an investigation into the cause and origin of the loss. (Tr. June 1 at 156); (Trial Ex. P-1).

38. Berkowitz gave Minto two Polaroid photographs that, according to Berkowitz and Vincent, showed the damage to the roof and the temporary repair. (Tr. June 1 at 157-58); (Tr. June

2 at 19); (Trial Ex. P-15(a), 15(b)).

39. In addition to the two photographs, Minto obtained estimates covering the interior repairs and a check for $10,800—which was never cashed—that purportedly represented the amount paid for the roof repair. (Tr. June 1 at 161-62); (Trial Ex. P-10, 11).

40. Minto was never given the opportunity to inspect the remnants of the old roof. (Tr. June 1 at 160).

41. Neither Berkowitz nor Vincent explained to Minto why the entire roof needed to be replaced, or why a temporary repair would not have been sufficient to mitigate the damage prior to the inspection. (Tr. June 1 at 160).

42. The Court finds, based on the testimony of Marinucci, that the temporary repair by Vincent, or, if needed, additional temporary repairs, could have been utilized to protect the property and, at the same time, allow representatives of State National to inspect the roof before the roof was replaced.

43. The Court finds that the complete roof replacement prevented Minto from determining the cause and origin of the loss, and the extent of the necessary roof repairs.

44. Because the entire roof was replaced before the claim was reported, the Court finds that Minto could not determine whether the entire roof needed to be replaced. (Tr. June 1 at 155).

45. Minto recommended to RCA that the claim be denied because State National's rights were prejudiced. (Tr. June 1 at 161); (Trial Ex. P-12).

46. RCA, by letter dated September 14, 2007, denied Berko's claim. (St. ¶ 9); (Trial Ex. P-14).

47. The denial letter states in pertinent part that: "Our investigation . . . revealed that the roof has already been replaced prior to inspection. Due to this we are unable to determine the exact cause

of the damage. Given the above findings, we cannot afford coverage for your claim as the conditions of the policy were violated and we cannot determine the cause and origin of the loss." (Trial Ex. P-14).

**III. DISCUSSION**

The Court discusses the evidence in this part of the Memorandum and incorporates its conclusions of law in this discussion pursuant to Federal Rule of Civil Procedure 52(a).

Plaintiffs assert that State National breached the Policy when it denied the insurance claim for wind and water damage that was submitted on April 30, 2007. State National counters that it was prejudiced because the roof was replaced before the claim was reported, thereby preventing State National from determining the cause and origin of the loss and the extent of the necessary roof repairs. For the reasons set forth below, the Court concludes that defendant was prejudiced by the late report of the claim, and finds in favor of defendant.

**A. State National's Claim of Prejudice**

The Policy requires the insured to take the following steps in the event of a loss: ". . . (2) Give us prompt notice of the loss or damage. Include a description of the property involved. (3) As soon as possible, give us a description of how, when and where the loss or damage occurred . . . ." In <u>Brakeman</u>, the Pennsylvania Supreme Court outlined a two-prong test to determine whether late notice, standing alone, is a permissible basis to reject an otherwise valid insurance claim. See <u>Brakeman v. Potomac Ins. Co.</u>, 371 A.2d 193, 198 (Pa. 1977). The court stated that in asserting a late notice defense, the insurer must prove that it (1) had a duties provision[1] in the contract that the

---

[1] In <u>Brakeman</u>, the court referred to the relevant provision of the policy as a "notice provision." <u>Brakeman</u>, 371 A.2d at 198. In this case, the notice provision will be referred to as a "duties provision" as it describes plaintiffs' duties under the policy, one of which is the duty to give prompt notice.

insured breached; and (2), the breach resulted in actual prejudice. Id.; see also Compagnie des Bauxites de Guinea v. Ins. Co. of North Am., 794 F.2d 871, 875 (3d Cir. 1986) (applying the rule in Brakeman). Merely failing to give immediate notice, absent actual prejudice, will not defeat an insurer's obligations under the insurance policy. Frankford Candy & Chocolate Co., Inc. v. Valiant Ins. Co., No. 01534 Aug. Term 2004, 2006 WL 224237, at *2 (Pa. C.P. Ct., Phila. County June 24, 2006) (citing Rohm & Haas Co. v. Cont'l Cas. Co., 781 A.2d 1172 (Pa. 2001)).

### 1. Plaintiffs Two Week Delay in Reporting the Claim Violated the Duties Provision

The Duties Provision of the Policy states, and plaintiffs do not contest, that Berko had a duty to promptly notify State National in the event of a loss; to take reasonable steps to protect the property and/ or set the damaged property aside; and permit State National to inspect the damaged property to prove the loss or damage. (Find. ¶ 8). Plaintiffs' counsel, during closing arguments, also conceded that plaintiffs' notice was untimely. (Tr. June 2 at 91). As such, the Court finds that plaintiffs breached the Duties Provision contained in the Policy.

### 2. Plaintiffs' Breach Resulted in Actual Prejudice to Defendant

The crux of the dispute between the parties is whether plaintiffs' untimely report of the claim actually prejudiced defendant's rights under the Policy. The evidence establishes that, before Berko reported the claim, it had the entire roof replaced. (Find. ¶ 30). As a result of plaintiffs' actions, State National was prevented from inspecting the roof and determining the cause and origin of the damage, and what repairs were required. (Find. ¶¶ 45-46).

In Frankford Candy & Chocolate, the insured submitted a claim for, *inter alia*, property damage to failed air conditioning compressors. Frankford Candy & Chocolate, 2006 WL 224237, at *3. The court found in favor of the insured on this claim on the ground that it was prejudiced because the insured waited two years to file the claim, and discarded the compressors before the

insurer had an opportunity to inspect them. Id.; see also Metal Bank of Am., Inc. v. Ins. Co. of North Am., 520 A.2d 493, 498-99 (Pa. Super. Ct. 1987) (finding that the insurer was prejudiced insofar as it was deprived of the opportunity to investigate the facts and of the right to "gain early control of the proceedings," after the insured waited approximately twelve years—ten years of negotiations with federal and state authorities and two years of litigation over an alleged oil spill—to report the claim). Plaintiffs' actions in this case are similar to those of the insured in Frankford Candy & Chocolate. In both cases the property in question—the Venture Inn's roof and Frankford Candy's air conditioning compressors—were replaced and discarded before the insurer could inspect it. See Frankford Candy & Chocolate, 2006 WL 224237, at *3.[2]

Plaintiffs respond to defendant's claim of prejudice with two arguments: (1) the entire roof replacement was required under the Policy because the insured has a duty to take steps to prevent further damage; and/ or (2) Minto could have investigated the loss by interviewing Marinucci, Vincent, and examining the Polaroid photographs that Berkowitz gave him. The Court rejects both of these arguments.

First, plaintiffs assert that they had a duty under the Policy to "[t]ake all reasonable steps to protect the Covered Property from further damage" and that replacing the entire roof was necessary to comply with this provision of the Policy. However, the Court finds that a temporary repair was sufficient to protect the Venture Inn from further damage. (Find. ¶ 44). Such temporary repairs would have been sufficient to satisfy plaintiffs' duty to protect the property. Id. Therefore, plaintiffs' averment that the roof replacement was required to protect the property from further damage is

---

[2] Not relevant to this case, in Frankford Candy & Chocolate, 2006 WL 224237, at *3, a claim for spoiled chocolate was not barred by late notice because the insured preserved samples of the spoiled chocolate for the insurer to inspect. The Court notes that Berko did not save any parts of the old roof for State National to inspect. (Find. ¶ 42).

rejected.

Plaintiffs next argue that defendant had an affirmative duty to cure or mitigate any potential prejudice.[3] The Court finds no authority for this proposition.[4] Moreover, the assertion that defendant could have cured the prejudice by relying on Vincent and/ or Marinucci, neither of whom are agents of defendant, runs counter to the purpose of the Duties Provision. Duties provisions are designed to provide the insurer with "an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can proceed to disposition . . . of the claim." Brakeman, 371 A.2d at 197 (internal citations omitted). They also protect the insurance company from fraudulent and invalid claims by granting the insurer early control over the process. Id.

Even if defendant had an affirmative duty to mitigate prejudice, the only evidence presented by Berko was the statements and testimony of Vincent and Marinucci, and the Polaroid photographs. The Policy explicitly provides that State National has the right to the inspect the property for itself. It states: "As often as may be reasonably required, [the insured shall] permit *us* to inspect the property proving the loss or damage and examine your books and records." (emphasis added). (Find. ¶ 8). State National was certainly not required to rely on the uncorroborated statements of Vincent and Marinucci, and there was inconsistent (or a lack of) evidence as to who took the photographs and when they were taken. (Tr. June 2 at 19, 45).

---

[3] The Court granted both parties additional time to brief this issue at the conclusion of trial. Both parties complied and filed supplemental memoranda on the issue of whether an insurer has a duty to mitigate prejudice.

[4] Plaintiffs argue that Brakeman "logically" requires that the insurance company "show what alternative steps were taken to try and determine the cause of the damage." The Court disagrees. Brakeman does not address the issue of alternative steps, or mitigating actions, to cure prejudice; it deals solely with notice and the prejudice that results from untimely notice.

The Court concludes that plaintiffs' delay in reporting the claim was a breach of the Duties Provision and this breach resulted in actual prejudice to defendant's rights. See Brakeman, 371 A.2d at 198. Because the Court finds in favor of defendant, plaintiffs' claim of bad faith is moot.

## IV. CONCLUSION

To prevail on its claim of prejudice, defendant must prove that it: (1) plaintiffs breached the provision of the Policy which required prompt notice of their claim; and (2), the breach resulted in actual prejudice. Defendant has established both of these elements by a preponderance of the evidence. For those reasons, the Court finds in favor of the defendant. An appropriate order follows.